Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, SHAHD ERAKAT

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAHD ERAKAT, on behalf of herself and all similarly situated persons, <br><br> Plaintiff, <br> v. <br><br> WELLS FARGO & COMPANY, a Delaware corporation, <br><br> Defendant. | Case No.: <br><br> **CLASS ACTION COMPLAINT** <br><br> 1) Cal. Penal Code § 631 <br> 2) 18 U.S.C. § 2511(1)(a) <br> 3) Cal. Bus. & Prof. Code § 17200, *et seq.* <br> 4) Cal. Constitution Art. I § 1 <br> 5) Intrusion Upon Seclusion <br> 6) Unjust Enrichment |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff SHAHD ERAKAT ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant WELLS FARGO & COMPANY, a Delaware corporation ("Defendant" or "Wells Fargo"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.    NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.wellsfargo.com (the "Website"), a website that Defendant provides for public access and use.

2.    During her use of the Website, Plaintiff navigated to the multiple web pages including the following:

- https://www.wellsfargo.com/personal-loans/debt-consolidation-calculator/;
- https://www.wellsfargo.com/goals-credit/smarter-credit/manage-your-debt/tips-for-managing-debt/; and
- https://www.wellsfargo.com/goals-credit/smarter-credit/manage-your-debt/consider-debt-consolidation/.

3.    Defendant caused and permitted the interception of the contents of Plaintiff's communications with the Website, including the page URLs identifying what she was browsing, page titles and content categories associated with those URLs, and the referrer URLs reflecting prior navigation, which were transmitted to the Third Parties during the page-load process itself.

4.    As set forth in the Specific Allegations section of this Complaint below, Defendant surreptitiously embeds third-party tracking technologies on the Website that permit third parties to intercept the contents of users' electronic communications, including the page URLs reflecting what users are browsing, in real time and without notice or consent. Defendant intentionally deploys these technologies to accomplish its commercial objectives, including identity resolution, cross-session behavioral profiling,

2

audience segmentation, and the monetization of users' browsing activity through targeted advertising and real-time bidding.

5. Defendant deploys these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). Defendant has done so from prior to the beginning of the class period in this case and continuously through to today and ongoingly.

## II.    GENERAL ALLEGATIONS

6. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

7. When triggered, the pixel causes the user's browser to transmit data to third-party servers, including the contents of the user's communications with the Website such as page URLs identifying what the user is browsing, referrer URLs reflecting prior navigation, page titles, session-level identifiers, and browser and device characteristics.

8. When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Google Analytics Tracker (GA4)
- Google Ads / CCM Tracker
- Adobe Experience Cloud Tracker
- Yahoo Analytics Tracker

9. The third parties who operate the above-listed trackers use the intercepted contents of users' communications collected via the Website for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers" and their operators below are referred to collectively as the "Third Parties."

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

10. The Trackers are operated by distinct third parties, including Google LLC (as to the Google Analytics, Google CCM/GTM, and Google Ads Remarketing trackers), Adobe Inc. (as to the Adobe Experience Cloud tracker), and Yahoo Inc. (as to the Yahoo Analytics tracker) (collectively, the "Third Parties"). Defendant knowingly embeds and deploys the Trackers on the Website and configures them to execute automatically within users' browsers upon page load and navigation. As a result, Defendant causes the interception and transmission of the contents of users' electronic communications with the Website to servers controlled by the Third Parties. Defendant's conduct is intentional and coordinated, as the Trackers operate pursuant to Defendant's deliberate configuration and are not necessary to render the Website's core content or functionality.

11. The third-party tracking code executed contemporaneously with each page load and navigation event initiated by Plaintiff's browser. As the browser initiated each HTTP request to retrieve Website content, embedded scripts automatically caused the interception and transmission of the contents of users' communications with the Website to remote third-party endpoints during the page-load process itself, before the requested page finished rendering and without any user interaction or authorization.

12. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not consent to the contents of their communications with the Website being intercepted by third parties. The Website did not display any consent banner, pop-up, cookie notice, or other authorization mechanism requesting permission before deploying the Trackers to intercept user communications. Defendant did not obtain express prior consent for the interception and transmission of the contents of users' communications for advertising, analytics, or monetization purposes.

13. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

///

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

### III.    PARTIES

14.    Plaintiff SHAHD ERAKAT is a California citizen residing in Solano County, CA and has an intent to remain there.  Plaintiff was in California when she visited the Website, which occurred on multiple occasions during the class period including but not limited to on January 28, 2026.  The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

15.    WELLS FARGO & COMPANY is a Delaware corporation law that owns, operates, and controls the Website, an online platform through which Wells Fargo offers personal banking products, loan services, personal finance resources, and financial management tools to consumers nationwide.

16.    Wells Fargo is one of the largest banks in the United States, providing retail banking services, personal finance resources, loan products, and financial management tools to individual and institutional customers. Wells Fargo is a national banking association chartered under federal law and maintains its principal executive offices in San Francisco. Through its Website and related digital platforms, Wells Fargo serves millions of customers in California and throughout the United States.

17.    Wells Fargo conducts banking business nationwide and engages in product development, marketing, and commercial operations centered on its digital banking and financial services platform. Wells Fargo's business activities include operating the Website, through which consumers browse personal finance content, research debt management and borrowing options, and access banking, loan, and financial planning products.

18.    The Website, including the mobile site, serves as a core component of Wells Fargo's digital presence. The Website provides users with access to banking products, personal finance articles, loan information, debt management resources, and financial planning tools, and functions as the primary consumer-facing platform through which California users access Wells Fargo's personal banking and financial services. The Website is integrated into Wells Fargo's broader digital infrastructure and employs web-

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

based technologies that operate in connection with page loads, navigation, and user interaction.

## IV.    JURISDICTION AND VENUE

19.    Wells Fargo is subject to personal jurisdiction in this District. Wells Fargo operates retail banking branches throughout California and maintains offices across the state that are dedicated to retail banking, commercial lending, and regional banking operations.

20.    The Website serves as a primary digital channel through which Wells Fargo markets and provides banking products, loan services, and personal finance resources to California consumers. In furtherance of those operations, Wells Fargo entered into and maintained commercial partnerships with California-based technology companies, including Google LLC, headquartered in Mountain View, Adobe Inc., headquartered in San Jose, and Yahoo Inc., headquartered in Sunnyvale.

21.    Through those partnerships and others, Wells Fargo embedded third-party tracking technologies into the Website that transmit California users' communications to California-based data infrastructure and servers operated by California-rooted companies. Plaintiff, a California resident, accessed the Website from California; the tortious interception of her communications occurred on her device in California; and the intercepted data flowed to California-based servers. Plaintiff's claims arise directly from Wells Fargo's purposeful direction of its Website and embedded data-collection systems at California residents and its use of California-based infrastructure to capture and exploit their private communications. Accordingly, the exercise of personal jurisdiction over Wells Fargo in this Court is proper.

22.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of 18 U.S.C. § 2511(1)(a) of the Federal Wiretap Act.

/ / /

23.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy.

24.    This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class, and the parties are minimally diverse.

25.    Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred within this District: Plaintiff resides in Solano County, California, which is within the Eastern District, and Plaintiff accessed the Website and was subjected to the interception of her electronic communications from within this District. Defendant regularly transacts business throughout California, including with customers residing within this District, and derives substantial revenue from California customers within this District.

## V.    FEDERAL AND STATE PRIVACY LAWS

### 1.    *The California Invasion of Privacy Act (CIPA)*

26.    The California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

27.    Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of email content and online communications and consent under CIPA must be obtained before the interception

7

occurs.

28.    CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted "to protect the right of privacy of the people of this state."  CIPA codifies a substantive right to privacy such that the violations of CIPA alleged herein constitute concrete injuries sufficient to establish Article III standing.

29.    Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

**2.    *The Federal Wiretap Act***

30.    The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy Act (ECPA) of 1986, prohibits the intentional interception of wire, oral, or electronic communications. Congress enacted the statute to safeguard the privacy of communications against unauthorized interception, recognizing that unchecked surveillance technology poses a fundamental threat to individual liberty.

31.    The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce."  That includes data transmitted over the internet such as the contents of web browsing activity via HTTP requests as alleged here.

32.    In *In re Facebook, Inc. Internet Tracking Litigation,* 956 F.3d 589 (9th Cir. 2020), the Ninth Circuit held that plaintiffs plausibly alleged Facebook was not a "party" to the relevant communications for purposes of the Wiretap Act and Cal. Penal Code § 631(a) party exemption, where Facebook's plug-in code allegedly caused users'

8

browsers, without their knowledge, to duplicate referer-header information from GET requests sent to third-party websites and transmit that information to Facebook through a separate, simultaneous channel. The court concluded that this type of simultaneous, unknown duplication did not entitle Facebook to the party exemption as a matter of law at the pleading stage. In distinguishing cases involving IP addresses and basic site-level URLs, the court further recognized that the alleged full-string URLs and referer headers there could reveal the particular documents viewed, search terms, and other information about users' interests and browsing activity, and therefore were materially different from bare routing information. The court expressly limited its holding to the sufficiency of the allegations and declined to decide the other statutory elements.

33.    A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day for each day of violation or $10,000, whichever is greater, plus punitive damages in appropriate cases, reasonable attorney's fees, and other litigation costs reasonably incurred.

## VI.    SPECIFIC ALLEGATIONS

34.    During her use of the Website, Plaintiff navigated to pages identifying personal and private subject matter, including the specific URLs identified above. Each Tracker section below shows what occurs during live browser access to those pages. Plaintiff alleges on information and belief that the same tracking mechanisms depicted below operated on the Website during Plaintiff's visit on January 28, 2026.

### 1.    The Google Trackers

35.    Defendant embedded and deployed three tracking instruments operated by Google LLC on the Website: Google Analytics 4 (analytics.google.com/g/collect), Google Campaign Manager/Tag Manager (google.com/ccm/collect), and Google Ads Remarketing (google.com/pagead/1p-user-list) (collectively, the "Google Trackers"). The Google Trackers monitor website visitor activity, transmit the full URL of pages

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

visited together with persistent visitor identifiers to Google's servers in real time, and enable cross-session visitor profiling and interest-based advertising targeting. During Plaintiff's session, the Google Trackers received the full URL of each debt-related page Plaintiff browsed together with Plaintiff's persistent visitor identifier in the same outbound requests.

36.    Figure 1 shows a Fiddler Classic raw request capture of a POST request from the Debt Consolidation Calculator page (https://www.wellsfargo.com/personal-loans/debt-consolidation-calculator/) to analytics.google.com/g/collect. The request payload contains the dl= parameter set to the complete URL of the calculator page, together with cid=, a persistent client identifier linking the transmission to a cross-session browsing profile. The Fiddler session list reflects Google Analytics 4 requests firing automatically during page load, establishing that interception occurs simultaneously with the transmission of communications to Wells Fargo's server.

**<u>Figure 1</u>**

37.    Likewise, Figure 2 shows a Chrome DevTools Network capture of the same Google Analytics 4 POST request. The payload contains the dl= parameter set to the complete calculator page URL together with cid=, a persistent client identifier. The

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

calculator page URL and the persistent identifier appear together in the same outbound request, confirming same-request co-appearance of page content and a cross-session profile link.

**Figure 2**



38.     Figure 3 shows a Fiddler Classic raw request capture of a POST request from the Tips for Managing Debt page (https://www.wellsfargo.com/goals-credit/smarter-credit/manage-your-debt/tips-for-managing-debt/)                                to analytics.google.com/g/collect. The request payload contains the dl= parameter set to the complete URL of the tips page, together with cid=, a persistent client identifier. The Fiddler session list reflects Google Analytics 4 requests firing automatically during page load, establishing that interception occurs simultaneously with the transmission of communications to Wells Fargo's server.

/ / /

/ / /

11

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 3**



39.    Likewise, Figure 4 shows a Chrome DevTools Network capture of the same Google Analytics 4 POST request from the Tips for Managing Debt page. The payload contains the dl= parameter set to the complete tips page URL together with cid=, a persistent client identifier. The page URL and the persistent identifier appear together in the same outbound request, confirming same-request co-appearance of page content and a cross-session profile link.

/ / /

/ / /

/ / /

12

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 4**



40.    Figure 5 shows a Fiddler Classic raw request capture of a POST request from the Consider Debt Consolidation page (https://www.wellsfargo.com/goals-credit/smarter-credit/manage-your-debt/consider-debt-consolidation/)                            to analytics.google.com/g/collect. The request payload contains the dl= parameter set to the complete URL of the consolidation page, together with cid=, a persistent client identifier. The Fiddler session list reflects Google Analytics 4 requests firing automatically during page load, establishing that interception occurs simultaneously with the transmission of communications to Wells Fargo's server.

/ / /

/ / /

/ / /

13

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 5**



41.     Likewise, Figure 6 shows a Chrome DevTools Network capture of the same Google Analytics 4 POST request from the Consider Debt Consolidation page. The payload contains the dl= parameter set to the complete consolidation page URL together with cid=, a persistent client identifier. The page URL and the persistent identifier appear together in the same outbound request, confirming same-request co-appearance of page content and a cross-session profile link.

/ / /

/ / /

/ / /

14

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 6**



42. Google LLC's servers returned responses to each Google Analytics 4 POST request confirming receipt of the intercepting transmissions, and Google's servers at google.com returned HTTP 200 OK responses to each Google Campaign Manager and Google Ads Remarketing request, confirming that Google received and processed those intercepting transmissions in real time, during Plaintiff's communications with the Website. The npa=0 parameter present in each Google Trackers request establishes that Google processed Plaintiff's data for personalized advertising without restriction. The cid identifier is derived from the _ga cookie stored on the wellsfargo.com first-party domain and is immune to browser-based cookie restrictions. Plaintiff and the Class Members did not consent to persistent identifiers linking their page visits or their communications with the Website across sessions or to their Google advertising profile.

43. Google LLC used the intercepted browsing data, including the sensitive URLs identifying Plaintiff's specific browsing activity regarding debt management and debt consolidation, to build behavioral profiles and participate in real-time bidding auctions, enabling advertisers to target Plaintiff based on the intercepted content. Google's advertising systems use the intercepted URL contents to classify users into

15

interest segments and bid for the right to display targeted advertising to those users across the web.

44. The Google Trackers are third parties to the communications between Plaintiff and Wells Fargo. Plaintiff and Class Members did not consent to interception of the contents of their communications by the Google Trackers. Wells Fargo implemented no controls to limit or prevent the transmission of URL contents to Google's servers; the npa=0 parameter present in each request confirms personalized advertising was enabled with no opt-out applied and no GDPR, us_privacy, or Do Not Track signals were sent. The sensitive URLs constitute the contents of Plaintiff's electronic communications within the meaning of Cal. Penal Code § 631 and 18 U.S.C. § 2510(8). The Google Trackers read those contents in real time simultaneously with Plaintiff's communications with the Website. By causing Google LLC to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

### *2.      The Adobe Experience Cloud Tracker*

45. Defendant embedded and deployed Adobe Experience Cloud tracking technology on the Website, a behavioral analytics and advertising platform operated by Adobe Inc. The Adobe Experience Cloud tracker monitors website visitor activity, transmits the full URL of pages visited together with a persistent Experience Cloud ID ("ECID") to Adobe's servers in real time, and enables cross-session visitor profiling and interest-based advertising targeting. During Plaintiff's session, Adobe received the full URL of the Tips for Managing Debt page together with Plaintiff's persistent ECID in the same outbound POST requests.

46. Figure 7 shows a Fiddler Classic raw request capture of a POST request from the Tips for Managing Debt page (https://www.wellsfargo.com/goals-credit/smarter-credit/manage-your-debt/tips-for-managing-debt/) to edge.adobedc.net/ee/ors/v1/interact. The Referer header of the request reflects the tips-for-managing-debt URL. The POST body contains the web.webPageDetails.URL field

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

set to the complete tips page URL, together with the ECID value in the same structured JSON payload. The Fiddler session list reflects Adobe Experience Cloud requests firing automatically during page load, establishing that interception occurs simultaneously with the transmission of communications to Wells Fargo's server.

**<u>Figure 7</u>**



47.    Likewise, Figure 8 shows a Chrome DevTools Network capture of the same POST request payload. The web.webPageDetails.URL field is set to the complete URL of the Tips for Managing Debt page, and the ECID value appears in the same payload. The page URL and the persistent ECID appear together in the same outbound request, confirming same-request co-appearance of page content and a cross-session profile link. The domain field is set to wellsfargo.com and the cookiesEnabled field is set to true, confirming that the ECID is stored in a first-party cookie on the Website's own domain and is immune to browser-based cookie restrictions.

///

///

17

**Figure 8**



48.    Adobe Inc.'s servers at edge.adobedc.net returned an HTTP 200 OK response to the POST request, confirming that Adobe received and processed the intercepting transmission in real time, during Plaintiff's communications with the Website. The ECID is stored in the AMCV_ first-party cookie on the wellsfargo.com domain and is immune to browser-based cookie restrictions. Plaintiff and the Class Members did not consent to persistent identifiers linking their page visits or their communications with the Website across sessions or to their Adobe Experience Cloud profile.

49.    Adobe Inc. used the intercepted browsing data, including the URL of the Tips for Managing Debt page identifying Plaintiff's interest in debt management, to build behavioral profiles and enable cross-channel advertising targeting. Adobe's Experience Cloud platform uses the intercepted URL contents and persistent ECID to classify users and support targeted advertising delivery across the web.

50.    The Adobe Experience Cloud tracker is a third party to the communications between Plaintiff and Wells Fargo. Plaintiff and Class Members did not consent to interception of the contents of their communications by Adobe's tracking technology.

18

The sensitive URL constitutes the contents of Plaintiff's electronic communication within the meaning of Cal. Penal Code § 631 and 18 U.S.C. § 2510(8). The Adobe Experience Cloud tracker read those contents in real time simultaneously with Plaintiff's communications with the Website. By causing Adobe Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

### 3.    The Yahoo Analytics Tracker

51.    Defendant embedded and deployed Yahoo Analytics tracking technology on the Website, a behavioral analytics platform operated by Yahoo Inc. The Yahoo Analytics tracker monitors website visitor activity, transmits the full URL and page title of pages visited to Yahoo's servers in real time, and enables cross-session visitor profiling and interest-based advertising targeting. During Plaintiff's session, Yahoo received the full URL of the Debt Consolidation Calculator page together with the page title in the same outbound request.

52.    Figure 9 shows a Fiddler Classic raw request capture of a GET request to sp.analytics.yahoo.com/sp.pl from the Debt Consolidation Calculator page (https://www.wellsfargo.com/personal-loans/debt-consolidation-calculator/).    The request URL contains the encoded page title "Debt Consolidation Calculator | Wells Fargo" confirming the page context of the capture. The Referer header reflects the wellsfargo.com origin. The Fiddler session list reflects Yahoo Analytics requests firing automatically during page load, establishing that interception occurs simultaneously with the transmission of communications to Wells Fargo's server.

/ / /

/ / /

19

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 9**



53.    Likewise, Figure 10 shows a Chrome DevTools Network capture of the same GET request and its response. The request contains the f= parameter set to the complete URL of the Debt Consolidation Calculator page (https://www.wellsfargo.com/personal-loans/debt-consolidation-calculator/) and the b= parameter set to the page title. The response returned HTTP 200 OK status and set a persistent Yahoo visitor identifier cookie on the .yahoo.com domain with an expiration of approximately one year. The sensitive page URL and the persistent identifier appear in the same request-response transaction, confirming co-appearance of page content and a cross-session profile link.

/ / /

/ / /

/ / /

20

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 10**



54.     Yahoo Inc.'s servers at sp.analytics.yahoo.com returned an HTTP 200 OK response to the GET request, confirming that Yahoo received and processed the intercepting transmission in real time, during Plaintiff's communications with the Website. The f= parameter in the request contained the full URL of the Debt Consolidation Calculator page, which reveals Plaintiff's interest in debt consolidation financial products. Plaintiff and the Class Members did not consent to the URL of this page or the page title being transmitted to Yahoo's servers or to persistent identifiers linking their page visits to their Yahoo profile.

55.     Yahoo Inc. used the intercepted browsing data, including the URL of the Debt Consolidation Calculator page revealing Plaintiff's interest in debt consolidation financial products, to build behavioral profiles and enable interest-based advertising targeting. Yahoo's analytics systems use the intercepted URL contents and persistent identifiers to classify users and support targeted advertising delivery.

56.     The Yahoo Analytics tracker is a third party to the communications between Plaintiff and Wells Fargo. Plaintiff and Class Members did not consent to interception of the contents of their communications by Yahoo's tracking technology. The sensitive

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

URL and page title constitute the contents of Plaintiff's electronic communication within the meaning of Cal. Penal Code § 631 and 18 U.S.C. § 2510(8). Yahoo read those contents in real time simultaneously with Plaintiff's communications with the Website. By causing Yahoo Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

## VII.    CLASS ALLEGATIONS

57.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website were intercepted by one or more Trackers between January 28, 2025 and the present.

58.    NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

59.    COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendant configured the Website to transmit the URL contents of visitors' HTTP requests to the Trackers;

- Whether the URL contents of those requests constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);

- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);

- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);

22

- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief; and
- Whether Class Members are entitled to restitution.

60. TYPICALITY: As a person who visited the Website and whose URL contents were intercepted by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

61. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

62. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VIII.   FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 631

*By Plaintiff and the Class Members Against All Defendants*

63. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

64. Plaintiff brings this cause of action on behalf of herself and the Class.

65. California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit, and from using or attempting to use, in any manner or for any purpose,

any information so obtained.

66.     The full URLs of Plaintiff's and Class members' HTTP requests to the Website constitute the "contents" of those communications within the meaning of § 631(a). As described in the preceding tracker-specific allegations, the Trackers received human readable copies of URL strings in the same HTTP request or response in which the Website servers received it, while that communication was in transit between Plaintiff's browser and the Website.

67.     Defendant intentionally configured its website to transmit Plaintiff's and Class members' URL contents to the Trackers and itself received and used those URL contents for audience segmentation and ad targeting, and permitted the Trackers to use that information for user profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website.  Plaintiff and Class members did not consent to interception of the contents of their communications by any Tracker, and no other exception to § 631(a) applies.

68.     Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and such other relief as the Court deems just and proper.

## IX.    SECOND CAUSE OF ACTION

### Violations of 18 U.S.C. § 2511(1)(a)

### *By Plaintiff and the Class Members Against All Defendants*

69.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

70.     Plaintiff brings this cause of action on behalf of herself and the Class.

71.     18 U.S.C. § 2511(1)(a) prohibits any person from intentionally intercepting any wire, oral, or electronic communication. The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

24

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

72. The full URLs of Plaintiff's and Class members' HTTP requests to the Website are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8). Those URLs communicate the substance and meaning of Plaintiff's and Class members' event browsing. As described in the preceding tracker-specific allegations, the Trackers intercepted URL contents in real time, in the same HTTP request or response in which the Website's servers received them, while those communications were in transit.

73. Defendant intentionally configured its website to transmit Plaintiff's and Class members' URL contents to each Tracker, and itself received and used those URL contents for audience segmentation and ad targeting. The Trackers are third parties to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to this interception, and no other exception applies.

74. Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of actual damages plus any profits made by Defendant through the interception, or statutory damages of $100 per day per violation or $10,000, whichever is greater, together with punitive damages, reasonable attorney's fees, and litigation costs.

## X.   THIRD CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

#### *By Plaintiff and the Class Members Against All Defendants*

75. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

76. Plaintiff brings this cause of action on behalf of herself and the Class.

77. California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendant's conduct constitutes both an unlawful and an unfair business practice.

78. Defendant's conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent,

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Defendant violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a). Each statutory violation constitutes a predicate unlawful business act or practice under § 17200.

79. Defendant's conduct is also unfair. Defendant covertly transmitted Plaintiff's and Class members' visitors' URL contents to third-party Trackers for commercial monetization without disclosure, authorization, or compensation. The harm to Plaintiff and the Class including but not limited to the interception and commercial exploitation of sensitive personal information and the financial value thereof is substantial, is not outweighed by any legitimate countervailing benefit, and could not reasonably have been avoided by Plaintiff or Class members.

80. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's conduct. Browsing data identifying the specific content a user views, including browsing URLs of the kind intercepted here, has recognized and quantifiable economic value in the digital advertising marketplace. Each Tracker enabled by Defendant used that intercepted URL content to build behavioral profiles and to participate in real-time bidding auctions in which advertisers pay measurable clearing prices for access to audiences identified by precisely this kind of browsing activity.

81. Plaintiff and Class members provided their browsing data as implicit consideration for access to the Website, a data-for-services exchange that was not disclosed and to which they did not consent. Defendant and the Trackers are designed to and on information and belief did capture the economic benefit of that exchange, in the form of advertising revenue and RTB clearing prices generated by the Trackers' use of users' intercepted URL data, without compensating Plaintiff or Class members. Plaintiff and Class members were thereby deprived of the economic value of their data and of the full value of a privacy-protective browsing experience they reasonably expected and would have bargained for had the exchange been disclosed.

82. Plaintiff and the Class are entitled to injunctive relief prohibiting Defendant

from continuing its unlawful and unfair practices, restitution of monies acquired by Defendant through those practices, and reasonable attorney's fees pursuant to California Code of Civil Procedure § 1021.5.

## XI.    FOURTH CAUSE OF ACTION

### Violation of the California Constitution, Article I, Section 1

### *By Plaintiff and the Class Members Against All Defendants*

83.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

84.    Plaintiff brings this cause of action on behalf of herself and the Class.

85.    Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

86.    Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page URLs reflecting their browsing activity. California law recognizes a legally protected privacy interest in personal browsing activity, particularly when that activity is covertly intercepted by commercial third parties for advertising and profiling purposes without disclosure or consent.

87.    Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person visiting a personal banking and financial services website does not expect that the specific pages they browse will be covertly transmitted to multiple separate third-party commercial tracking companies in real time, linked to persistent cross-session user profiles, and used for advertising targeting, behavioral analytics, and commercial monetization.

/ / /

27

88.     Defendant's conduct constitutes a serious invasion of that privacy. By deliberately embedding and configuring three third-party tracking technologies on the Website, Defendant caused the real-time, covert interception of the URL contents of Plaintiff's and Class Members' electronic communications and their transmission to Google LLC, Adobe Inc., and Yahoo Inc., where they were linked to persistent cross-session profiles and used for commercial advertising and analytics purposes without Plaintiff's knowledge or consent. The severity of the invasion is heightened by the nature of the personal banking and financial services website, the sensitivity of the content browsed, the persistent and cross-platform nature of the identifiers used, and the commercial exploitation of the intercepted data.

89.     As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their browsing activity. Plaintiff and the Class seek injunctive relief, nominal damages, and all other relief authorized by law.

## XII.     FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion

### *By Plaintiff and the Class Members Against All Defendants*

90.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

91.     Plaintiff brings this cause of action on behalf of herself and the Class.

92.     The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

93.     Defendant intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding three third-party tracking technologies that intercepted the URL contents of those communications in real

time and transmitted them to Google LLC, Adobe Inc., and Yahoo Inc. without Plaintiff's knowledge or consent. Plaintiff had a reasonable expectation of privacy in the contents of those communications.

94. The intrusion is highly offensive to a reasonable person. Defendant covertly deployed tracking technologies that captured the specific content Plaintiff was browsing on a personal banking and financial services website and transmitted it to three separate third-party commercial entities for advertising targeting and behavioral profiling. The covert and non-consensual nature of the interception, the nature of the Website and the sensitivity of the content browsed, the commercial exploitation of the intercepted browsing activity for advertising and data analytics purposes, and the use of persistent cross-session identifiers to build comprehensive user profiles without disclosure all render the intrusion highly offensive to a reasonable person.

95. As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their personal information. Plaintiff and the Class seek compensatory damages, nominal damages, injunctive relief, and all other appropriate relief.

## XIII.    SIXTH CAUSE OF ACTION

### Unjust Enrichment

#### *By Plaintiff and the Class Members Against All Defendants*

96. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

97. Plaintiff brings this cause of action on behalf of herself and the Class.

98. Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

99. Defendant received a benefit by permitting Google LLC, Adobe Inc., and Yahoo Inc. to deploy their tracking technologies on the Website. In exchange for

allowing these third parties to intercept and collect the URL contents of visitors' communications with the Website, Defendant received monetary compensation, data licensing benefits, promotional support, or other commercial value. Defendant's arrangement with these tracking operators enabled it to offer analytics, retargeting, and advertising services that generated commercial revenue and business value.

100.    Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By intercepting the URL contents of Plaintiff's communications and transmitting them to third-party trackers, Defendant and its tracking partners extracted the commercial value of that data without compensation. Plaintiff and Class Members also suffered the loss of control over their personal information, which has recognized economic value as a privacy-protective property interest.

101.    It is inequitable for Defendant to retain the benefits of its data-for-services arrangement without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value. Defendant's concealment of the tracking arrangement and its failure to obtain Plaintiff's and Class Members' informed consent render retention of those benefits unjust.

102.    Plaintiff and the Class seek restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense.

## XIV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1.    An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2.    An order declaring that Defendant's conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law prohibition against intrusion upon seclusion;

3.  An order enjoining Defendant from continuing the conduct alleged herein;

4.  Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;

5.  Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of actual damages plus any profits made by Defendant through the violation, or $100 per day per violation or $10,000, whichever is greater;

6.  Punitive damages pursuant to 18 U.S.C. § 2520;

7.  Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;

8.  Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;

9.  Compensatory and nominal damages for intrusion upon seclusion;

10. Restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense;

11. Prejudgment interest;

12. Reasonable attorney's fees and costs; and

13. Such other and further relief as the Court deems just and proper.

/ / /

/ / /

/ / /

31

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated:   April 6, 2026          **LAW OFFICES OF ROSS CORNELL, APC**

By: */s/ Ross C. Cornell*
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

*Attorneys for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED